1

2

3

4

5

6

7

8

9

10



FILED

18 JAN 31 AM 7:40

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18

| | |
|---|---|
| SHERWOOD MARKETING GROUP, LLC, | Case No.: 3:17-cv-00782-BEN-NLS |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| INTERTEK TESTING SERVICES, N.A., INC., doing business as Intertek Testing Services, | |
| Defendant. | |

19      Before the Court is Defendant Intertek Testing Services, N.A., Inc. d/b/a/ Intertek

20  Testing Services' ("Intertek's") motion to dismiss or stay pending arbitration. (Docket

21  No. 12.) The motion is fully briefed. Intertek's motion is **GRANTED**.

22                              **BACKGROUND**[1]

23      Plaintiff Sherwood Marketing Group, LLC ("Sherwood") is a California limited

24  liability company with its principal place of business in San Diego, California. Sherwood

25  ///

26

27  _____

28  [1] The following overview of the facts are drawn from the allegations of the Plaintiff's
    First Amended Complaint ("FAC"). The Court is not making findings of fact.

imports, markets, and sells consumer products throughout the United States. Sherwood has no contract with Intertek. But there is an international connection.

Defendant Intertek is a Delaware corporation with its principal place of business in Cortland, New York. Intertek "engages in testing, inspection and certification of products and commodities to, primarily, North American Safety standards." (FAC ¶ 3.) Prior to performing inspection and certification services, Intertek requires its customers to sign a contract, i.e., a "Certification Agreement." (*Id.*) According to the Certification Agreement, Intertek "represents that it 'provides a service for evaluating whether products provided by the Manufacturer comply with designated standard or specified requirements.'" (*Id.*) In Section 2.1 of the Certification Agreement, Intertek states it is "an independent laboratory providing testing and evaluation services to determine whether representative samples of a Product comply with designated national and international standards, specifications, and/or codes." (*Id.*)

Plaintiff was founded in June 2013. In July 2013, Plaintiff began developing its "3 Squares" brand of "modern, innovative and affordable electric kitchen appliances, including rice cookers." (*Id.* ¶ 15.) By October 2013, Plaintiff had developed design and function ideas for the "TIM3 MACHIN3" rice cooker. (*Id.* ¶ 16.) Plaintiff contacted Zhongshan Leeper Household Electric Appliance Company, Ltd. ("Leeper"), a prominent China-based manufacturer, to build a prototype of the TIM3 MACHIN3 for purposes of future mass manufacture and sale in the United States. Based on "an impressive prototype" Leeper fabricated, Plaintiff decided to move forward with Leeper as its manufacturer for the TIM3 MACHIN3. (*Id.* ¶ 19.) Leeper is not a party to this action.

Here is the connection. Although it was not required by law, Plaintiff "insisted Leeper have the rice cookers safety [sic] tested and certified compliant to certain safety standards by a third party testing agency *like Intertek.*" (*Id.* ¶ 20) (emphasis added.) Specifically, Plaintiff "sought certification for . . . UL 1026:2012, 'Electric Household Cooking And Food Serving Appliances,' . . . and CSA C22.2 Ed: 7 'Household Cooking and Liquid-Heating Appliances'" (together, the "Safety Standards"). (*Id.* ¶ 21.)

2

Leeper contacted Intertek to inquire about its ability to test the Safety Standards, and Intertek "represented to Leeper and in turn [Plaintiff]" that it could perform the requested testing. (*Id.* ¶¶ 22-23.) Intertek further "represented to Leeper and in turn [Plaintiff] that it would perform all of the required testing and do so properly and accurately." (*Id.* ¶ 24.) "Leeper ultimately agreed to have Intertek NA perform the required safety testing at its Guangzhou laboratory based on these express representations." (*Id.* ¶ 26.)

On or about March 19, 2014, "Leeper submitted multiple samples" of its initial rice cooker, Model No. MPR50068A, to Intertek at its parent company's laboratory in Guangzhou, China (hereinafter referred to as "the Guangzhou laboratory"). (*Id.* ¶¶ 2, 34.) On May 27, 2014, Intertek issued a report warranting that the Model No. MPR50068A samples complied with the Safety Standards. On May 28, 2014, Intertek "issued Leeper an ATM,[2]" which authorized Leeper to affix a certain mark on the MPR50068A rice cookers to signify compliance with the Safety Standards. (*Id.* ¶ 48.) Subsequently, between May 28, 2014 and August 18, 2015, Intertek conducted several unannounced audits of Leeper's manufacturing facility to ensure the MPR50068A rice cookers were being manufactured in accordance with the design approved by Intertek. Intertek issued Leeper several reports affirming the MPR50068A rice cookers' continued compliance with the Safety Standards. (*See id.* ¶¶ 50-62.)

Beginning in August 2015, "based on the myriad of representations of Intertek as herein described," Plaintiff began shipping units of the rice cooker to retail stores such as Costco and Target. (*Id.* ¶¶ 63-64.) Sometime around October 2015, after Plaintiff entered in an agreement with Costco to sell the rice cooker throughout its chain, Plaintiff "decided to modify the rice cooker to create a model with a fixed, non-detachable power cord" to "decrease returns of functioning units from customers who did not properly

---

[2] ATM is an acronym for "Authorization to Mark." (FAC ¶ 10.)

1  attach the removable cord." (*Id.* ¶¶ 65-66.) Shortly thereafter, Leeper fabricated and sent

2  Plaintiff "a new, non-detachable power cord model of the rice cooker." (*Id.* ¶ 67.)

3      In November 2015, "Leeper submitted multiple samples" of two different rice

4  cookers, Model Nos. MPR50608A[3] and MPR50108A, to Intertek at the Guangzhou

5  laboratory. (*Id.* ¶ 70.) Except for the optional construction of the non-detachable power

6  supply cord, Model No. MPR50608A was identical to the initial rice cooker (Model No.

7  MPR50068A). (*Id.* ¶ 72.) Intertek was responsible for testing the new rice cookers for

8  compliance with the Safety Standards. (*Id.* ¶ 74.) "In the event the non-detachable

9  power cord model rice cookers did not comply with the Safety Standards, Intertek NA

10  was responsible for alerting Leeper of the non-compliance so same could be fixed prior to

11  distribution and sale." (*Id.*)

12      On November 30, 2015, Intertek issued an "ETL[4] Data Sheet . . . demonstrating

13  that Leeper's model [MPR50608A] and MPR50108A rice cookers" fully complied with

14  the Safety Standards. (*Id.* ¶ 89.) On December 21, 2015, Intertek "issued Leeper an

15  ATM" which again authorized Leeper to affix a certain mark on the MPR50608A and

16  MPR50108A rice cookers to signify compliance with the Safety Standards. (*Id.* ¶ 101.)

17  "Shortly thereafter, Leeper manufactured thousands of rice cookers . . . for the purpose

18  of shipping said rice cookers into the United States where they would ultimately be sold

19  by [Plaintiff]." (*Id.* ¶ 102.) Subsequently, in March 2016, Plaintiff delivered the new rice

20  cookers to all Costco locations.

21      On May 9, 2016, Leeper submitted samples of a new Model No. MPR20068A to

22  Intertek at the Guangzhou laboratory for Safety Standards testing. Model No.

23  MPR20068A was "practically identical to the [MPR50608A] rice cooker" except that it

24  was smaller in some respects. (*Id.* ¶ 107.)

25

26

_____

27  [3] Plaintiff appears to have transposed some of the rice cooker model numbers. The
Court's summary of the facts attempts to correct the presumed typographical errors.

28  [4] The FAC does not define ETL.

4

On June 14, 2016, Intertek "issued Leeper an ATM," which again authorized Leeper to affix a certain mark on the MPR50608A, MPR50108A, and MPR20068A rice cookers to signify compliance with the Safety Standards. (*Id.* ¶ 127.)

On May 25, 2016, June 9, 2016, and July 5, 2016, three separate customers contacted Plaintiff to report heating and electrical problems with the MPR50608A rice cookers they had purchased. All three customers returned their rice cookers to Plaintiff, who sent them to a third party laboratory for failure analysis. The results of this analysis suggested Intertek's testing of the non-detachable power cord rice cookers was inadequate in some or all respects.

On July 28, 2016, Plaintiff began the process of recalling all rice cookers manufactured with a non-detachable power cord manufactured between November 2015 and June 2016. On August 4, 2016, Intertek was advised of the third party laboratory's failure analysis regarding the rice cooker's malfunctions.

In October 2016, Plaintiff contacted a second independent laboratory to test the non-detachable power cord rice cookers. The results of this testing suggested Intertek "failed to perform correctly or entirely critical portions of the normal temperature tests on the rice cooker." (*Id.* ¶ 147.)

## PROCEDURAL HISTORY

On April 18, 2017, Plaintiff filed a complaint against Intertek. (Docket No. 1.) On June 6, 2017, Intertek filed its first motion to dismiss or stay pending arbitration. (Docket No. 5.) Instead of filing an opposition to Intertek's motion, Plaintiff exercised its right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) and filed the operative First Amended Complaint asserting three claims for: (1) negligent misrepresentation, (2) fraudulent misrepresentation, and (3) violation of California Business and Professions Code §§ 17200, et seq. (Docket No. 9.) In response, Intertek filed the instant motion to dismiss or stay pending arbitration. (Docket No. 12.)

///

///

5

## LEGAL STANDARD

Section 2 of the Federal Arbitration Act ("FAA") states that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 demonstrates "'a national policy favoring arbitration' of claims that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 352–53 (2008) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

Under Section 3 of the FAA, where an issue involved in a suit or proceeding is referable to arbitration under an agreement in writing, the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. The language is mandatory, and district courts are required to order arbitration on issues as to which an arbitration agreement has been signed. *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1058 (9th Cir. 2013) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). The role of the district court is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Arbitration is a matter of contract, and a party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994). A court must determine whether there is an agreement to arbitrate before ordering arbitration. *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1048 (9th Cir. 1996).

## DISCUSSION

Intertek argues Plaintiff's action should be dismissed because all of its claims are subject to the mandatory arbitration clause in the Certification Agreement between Intertek and Leeper. The Certification Agreement states in relevant part:

6

> If the Client is located in China, any dispute or claim arising from or in connection with this Certification Agreement, its breach, its performance or non-performance shall be submitted to the China International Economic Trade Arbitration Commission ("CIETAC") Beijing Office for arbitration which shall be conducted in accordance with the Commission's arbitration rules in effect at the time of applying for arbitration.

(Mot. at p. 4; Declaration of Todd Andrews ("Andrews Decl.") ¶ 4, Ex. A.)

As an initial matter, the parties do not dispute that Plaintiff is not a signatory to the Certification Agreement, that "Client" refers to Leeper, or that Leeper is based and located in China. (*See* Mot. at p. 4 n.1; Andrews Decl. Ex. A; Opp'n at p. 9; FAC ¶ 17.) Additionally, although Plaintiff's opposition disputes that its claims arise out of the Certification Agreement, based on the allegations of the FAC, it is evident that Plaintiff's claims are at least connected with the Certification Agreement. In fact, as the Court detailed above, Plaintiff specifically quotes from the Certification Agreement and alleges Intertek's representations to Leeper were made "in turn" to Plaintiff during the performance of Intertek's obligations under the Certification Agreement. As a result, the Court concludes Plaintiff's claims, as pleaded, fall under the scope of the arbitration agreement. Accordingly, the Court must determine whether Plaintiff is precluded from bringing its claims by the arbitration clause.

Intertek argues Plaintiff is bound by the arbitration clause "as a matter of equitable estoppel and as a third party beneficiary." (Mot. at p. 12.) Plaintiff argues it is neither a third-party beneficiary of the Certification Agreement, nor equitably estopped from contesting the enforceability of the arbitration clause.

"Generally, the contractual right to compel arbitration 'may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration.'" *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (quoting *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993)). However, the Ninth Circuit has "recognized various exceptions to this rule grounded in state contract principles," namely: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-

7

1    piercing/alter ego; and 5) estoppel. *Tamsco Props., LLC v. Langemeier*, 597 F. App'x

2    428, 429 (9th Cir. 2015) (citing *Comer v. Micor, Inc.,* 436 F.3d 1098, 1101 (9th Cir.

3    2006)).

4          1.    <u>Third-Party Beneficiary</u>

5          Under the third-party beneficiary theory, an arbitration agreement may be enforced

6    against a nonsignatory where "the contract reflects the express or implied intention of the

7    parties to the contract to benefit the third party" and there is evidence the contracting

8    parties intended to give the third-party beneficiary the right to sue under the agreements.

9    *Comer*, 436 F.3d at 1102.

10         Here, notwithstanding Intertek's reliance on an email statement from Plaintiff's

11    counsel characterizing Plaintiff as "an interested party and direct beneficiary" to a report

12    created for Leeper under the Certification Agreement, the agreement itself lacks any

13    language to support a finding that Leeper and Intertek intended their contract to benefit

14    Plaintiff. (Mot. at p. 14; Andrews Decl. Ex. A.) Notably, as Plaintiff correctly identifies,

15    the Certification Agreement states: "Applicant agrees that Intertek has entered into a

16    contractual relationship with the Applicant to perform testing or evaluation services on

17    the Product. . . . Intertek does not guarantee or warrant that third parties will accept or

18    recognize the results obtained by Intertek or the Intertek certification of the Product."

19    (Andrews Decl. Ex. A.) The Certification Agreement solely defines "Applicant" as

20    Leeper. (*Id.*)

21         In short, the Court is not persuaded that Plaintiff was a third-party beneficiary to

22    the Certification Agreement, and thus is not bound by the arbitration clause under this

23    theory.

24          2.    <u>Equitable Estoppel</u>

25         On the other hand, equitable estoppel "precludes a party from claiming the benefits

26    of a contract while simultaneously attempting to avoid the burdens that contract

27    imposes." *Comer*, 436 F.3d at 1101 (quoting *Wash. Mut. Fin. Group, LLC v. Bailey*, 364

28    F.3d 260, 267 (5th Cir. 2004)) (internal quotation marks omitted). "In the arbitration

1   context, this principle has generated two lines of cases." *Id.* at 1101. Under the first line

2   of cases, in which the parties agree this case falls, "*nonsignatories* have been held to

3   arbitration clauses where the nonsignatory 'knowingly exploits the agreement containing

4   the arbitration clause despite having never signed the agreement.'" *Id.* (quoting *E.I.*

5   *DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269

6   F.3d 187, 199 (3d Cir. 2001)).

7       In *Comer*, the Ninth Circuit determined a nonsignatory was not equitably estopped

8   from avoiding an arbitration clause because the evidence showed the nonsignatory was

9   "simply a participant in trusts managed by others for his benefit," did not seek to enforce

10  the terms of the management agreements, "or otherwise take advantage of them." *Id.*,

11  436 F.3d at 1102. Additionally, the nonsignatory did not sue under the terms of the

12  agreements containing the arbitration clauses; his case was entirely based on the

13  Employee Retirement Income Security Act. *Id.* Plaintiff argues its position is similar to

14  the plaintiff in *Comer* in that "[t]o the extent [Plaintiff] received any benefit from the

15  certification agreement [sic], the benefit was of a passive nature." (Opp'n at p. 13.) The

16  Court disagrees.

17      Unlike the nonsignatory in *Comer*, the Court finds Plaintiff's own allegations

18  establish it was more than a "passive participant" in the Certification Agreement. First,

19  Plaintiff alleges it "insisted that Leeper have the rice cookers safety [sic] tested and

20  certified compliant to certain safety standards by a third party testing agency like Intertek

21  NA." (FAC ¶ 20.) Although Plaintiff alleges Leeper chose Intertek, this decision was

22  alleged to be based on "Leeper['s] *and, in turn, [Plaintiff's], reli[ance]* on Intertek NA

23  representation that Intertek NA and/or the [Guangzhou] laboratory, . . . was adequately

24  trained, experienced and able to properly test to the [Safety Standards]." (*Id.* ¶ 27)

25  (emphasis added.)

26      Second, throughout the FAC, Plaintiff alleges Intertek made various

27  representations "to Leeper and in turn [Plaintiff]" about its ability to test for compliance

28  with the Safety Standards, its performance of the requested testing, and ultimately the

9

various rice cookers' compliance with the Safety Standards. (*See generally* FAC.) These representations are drawn from either the Certification Agreement itself, or from Intertek as part of its performance of its duties under the Certification Agreement. (*Id.*) In other words, it does not appear from the allegations of the FAC that Intertek made any representations to Plaintiff that were not first made to Leeper, who impliedly relayed the representations to Plaintiff.

Third, unlike the plaintiff in *Comer*, Plaintiff's entire action appears to arise from Intertek's performance of its duties under the Certification Agreement,[5] i.e., that it failed to conduct the testing, misrepresented its ability to conduct the testing, misrepresented the results of the testing, and erroneously certified the noncompliant rice cookers as compliant with the Safety Standards. Thus, it appears Plaintiff is in fact knowingly attempting to exploit the terms of the Certification Agreement and simultaneously avoid the arbitration clause, and is therefore barred from raising these claims against Intertek. *Comer*, 436 F.3d at 1101.

3.    Whether the Case Should Be Stayed or Dismissed

Under Section 3 of the FAA, a federal court is required to stay the trial of an action "on application of one of the parties to stay the trial of the action until such arbitration has been had in accordance with the terms of this agreement." 9 U.S.C. § 3. Here, Intertek moves the Court to dismiss, rather than stay Plaintiff's case. Because the Court concludes Plaintiff's claims, as pleaded, fall under the Certification Agreement's arbitration clause and that Plaintiff is equitably estopped from avoiding arbitration of these claims, the Court finds Plaintiff's FAC is subject to dismissal for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

In its opposition, Plaintiff asserts "the factual foundation of [Plaintiff's] claims does not arise from the Certification Agreement. The core of [Plaintiff's] Complaint is

---

[5] Indeed, Plaintiff's FAC attached three exhibits which all appear to be issued by Intertek to Leeper regarding the Safety Standards testing. (*See* FAC, Exs. 1-3.)

Intertek's faulty testing of the rice cookers to the Safety Standards." (Opp'n at p. 15.) Although the Court finds Plaintiff's FAC fails to establish independent, non-arbitral claims, the Court shall permit Plaintiff an opportunity to file a second amended complaint that cures this deficiency. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant Intertek's Motion to Dismiss, and Plaintiff's FAC is **DISMISSED without prejudice.** Plaintiff's second amended complaint, if any, must be filed within **fourteen (14) days** of the date of this Order. If Plaintiff does not file an amended pleading, the Clerk of the Court shall close this case without further order from the Court.

**IT IS SO ORDERED.**

Dated: January 30, 2018

HON. ROGER T. BENITEZ
United States District Judge