UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERWOOD MARKETING GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>INTERTEK TESTING SERVICES, N.A., INC., doing business as Intertek Testing Services,<br><br>Defendant. | Case No.: 3:17-cv-00782-BEN-NLS<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

Before the Court is the motion to dismiss or stay pending arbitration filed by Defendant Intertek Testing Services, N.A., Inc. ("Intertek"). (Docket No. 23.) The motion is fully briefed. For the reasons that follow, the motion is **GRANTED**.

## BACKGROUND[1]

Plaintiff Sherwood Marketing Group, LLC ("Sherwood") was founded in 2013 and is a California limited liability company with its principal place of business in San Diego,

---

[1] The following overview of the facts are drawn from the allegations of the Plaintiff's Second Amended Complaint ("SAC"). The Court is not making findings of fact.

California. Sherwood imports, markets, and sells consumer products throughout the United States.

Defendant Intertek is a Delaware corporation with its principal place of business in Cortland, New York. Intertek is "an independent testing laboratory," whose business "involves testing products and making a determination whether the product complies with a given safety standard." (SAC ¶ 3.) Customers send product samples to Intertek, where Intertek's engineers perform tests to determine whether the product complies with a given safety standard. Intertek "then advises customers whether the product has passed or failed." (*Id.* ¶ 7.) Prior to this lawsuit, Sherwood did not have any contracts with Intertek. Nor does Sherwood allege that it directly communicated with Intertek. Instead, Sherwood alleges international third-party communications took place between them, in a manner best described as an international version of the pre-millennial children's game "telephone."

In July 2013, Sherwood began developing its "3 Squares" brand of "modern, innovative and affordable electric kitchen appliances, including rice cookers." (*Id.* ¶ 12.) By October 2013, Sherwood had developed design and function ideas for the "TIM3 MACHIN3" rice cooker. Sherwood provided this concept product to Zhongshan Leeper Household Electric Appliance Company, Ltd. ("Leeper"), a prominent China-based manufacturer, for the purpose of building a TIM3 MACHIN3 prototype that could eventually be mass manufactured and sold in the United States. In November 2013, based on "an impressive prototype" Leeper fabricated (Model No. MPR50068A), Sherwood decided to move forward with Leeper as its manufacturer for the TIM3 MACHIN3. (*Id.* ¶¶ 16, 23.) Leeper is not a party to this action.

Here is where Sherwood played telephone with Intertek and Leeper. "Prior to mass production, Leeper had the rice cookers safety tested" by Defendant. (*Id.* ¶ 17.) Intertek "was specifically aware of the fact that once it represented the rice cookers complied with the safety standards," Leeper and Sherwood would arrange for mass production of the rice cookers, which Sherwood would sell in North America. (*Id.* ¶ 33.)

On March 19, 2014, "Leeper submitted multiple samples" of the Model No. MPR50068A rice cooker to Intertek at its laboratory in Guangzhou, China (hereinafter referred to as "the Guangzhou laboratory"). (*Id.* ¶ 24.) Leeper had Intertek test the rice cookers for compliance with "UL 1026:2012, 'Electric Household Cooking And Food Serving Appliances,' . . . and CSA C22.2 Ed: 7 'Household Cooking and Liquid-Heating Appliances'" (together, the "Safety Standards"). (*Id.* ¶ 18.)

From March 19, 2014 to May 27, 2014, Intertek tested the MPR50068A rice cooker for compliance with the Safety Standards. On May 27, 2014, "Intertek represented to Leeper that the Model No. MPR50068A samples complied with the Safety Standards," which was then "communicated to Sherwood." (*Id.* ¶¶ 32, 34.) Relying on Intertek's representation to Leeper that the rice cookers were in compliance with the Safety Standards, Sherwood purchased a large number of the rice cookers from Leeper.

In February 2015, Sherwood shipped the first of several units of the Model No. MPR50068A rice cookers to Kohls Department Stores for retail sales, as well as marketing and selling them on Amazon.com. In August 2015, "based on representations of [Intertek to Leeper] as herein described," Sherwood began shipping units of the rice cooker to Costco. (*Id.* ¶¶ 38-39.)

In October 2015, Target began selling Sherwood's rice cooker as a test product. Around the same time, Sherwood met with Costco representatives and entered into an agreement whereby Costco would sell the rice cooker "chain-wide for a 6-month program in Spring 2016." (*Id.* ¶ 40.) Additionally, after entering the Costco agreement, Sherwood "decided to modify the rice cooker to create a model with a fixed, non-detachable power cord" to "decrease returns of functioning units from customers who did not properly attach the removable cord." (*Id.* ¶ 41.)

On October 12, 2015, Leeper fabricated and sent Sherwood "a new, non-detachable power cord model of the rice cooker." (*Id.* ¶ 42.) In November 2015, "Leeper

///

///

submitted multiple samples" of two different rice cookers, Model Nos. MPR50608A[2] and MPR50108A, to Intertek at the Guangzhou laboratory. (*Id.* ¶ 45.) Except for the optional construction of the non-detachable power supply cord, Model No. MPR50608A was identical to the initial rice cooker (Model No. MPR50068A). Intertek was responsible for testing the new rice cookers for compliance with the Safety Standards.

From November 16, 2015 to December 15, 2015, Intertek tested the MPR50608A and MPR50108A rice cookers for compliance with the Safety Standards. On November 30, 2015, Intertek engineer Ken Zhang "represented that Leeper's model MPR50608A and MPR50108A rice cookers with the non-detachable power supply cord fully complied with [the Safety Standards]." (*Id.* ¶ 64.) Subsequently, Intertek "represented to Leeper and, therefore, Sherwood that the rice cooker complied with the applicable safety standards." (*Id.* ¶ 68.)

Based on this representation to Leeper, Sherwood ordered "thousands of rice cookers with the non-detachable power supply cord for the purpose of selling said rice cookers to hundreds of Costco stores in the United States" pursuant to its agreement with Costco. (*Id.* ¶ 69.) In March 2016, Costco began selling the new non-detachable power supply cord rice cookers. Around this time, Sherwood met with Best Buy's representatives and Best Buy committed to selling the new non-detachable power supply cord rice cookers in their stores in Fall 2016.

On May 9, 2016, Leeper submitted samples of a new Model No. MPR20068A to Intertek at the Guangzhou laboratory for Safety Standards testing. Model No. MPR20068A was "practically identical to the MPR50608A rice cooker" except that it was smaller in some respects. (*Id.* ¶ 73.) From May 9, 2016 to May 20, 2016, Intertek tested the MPR20068A rice cooker for compliance with the Safety Standards. On May 18, 2016, Intertek "concluded that the rice cooker" complied with UL 1026. (*Id.* ¶ 73.)

---

[2] Plaintiff appears to have transposed some of the rice cooker model numbers. The Court's summary of the facts attempts to correct the presumed typographical errors.

On May 25, 2016, June 9, 2016, and July 5, 2016, three separate customers contacted Sherwood to report heating and electrical problems with the MPR50608A rice cookers they had purchased. All three customers returned their rice cookers to Sherwood, who sent them to a third-party laboratory for failure analysis. The results of this analysis suggested Intertek's testing of the non-detachable power cord rice cookers was inadequate in some or all respects. "Shortly thereafter, Sherwood retained a different third party laboratory to examine three field returned units to do failure analysis." (*Id.* ¶ 91.) The results of this testing suggested Intertek's testing "was entirely inadequate in all or some . . . respects[.]" (*Id.* ¶ 97.)

## PROCEDURAL HISTORY

On April 18, 2017, Plaintiff filed its initial complaint against Defendant asserting three claims for: (1) negligent misrepresentation, (2) fraudulent misrepresentation, and (3) violation of California Business and Professions Code §§ 17200, et seq. (Docket No. 1.) On June 6, 2017, Defendant filed its first motion to dismiss or stay pending arbitration. (Docket No. 5.) Instead of filing an opposition to Defendant's motion, Plaintiff exercised its right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B)[3] to file an amended complaint asserting the same three claims. (Docket No. 9.)

On July 6, 2017, Defendant filed its second motion to dismiss or stay pending arbitration. (Docket No. 12.) On January 30, 2018, this Court granted Defendant's motion and dismissed Plaintiff's First Amended Complaint ("FAC") after concluding Plaintiff was equitably estopped from avoiding arbitration of its claims. (Docket No. 21.)

On February 13, 2018, Plaintiff filed the operative Second Amended Complaint ("SAC"), which asserts a single claim for negligent misrepresentation. (Docket No. 22.) Defendant now moves for a third time to dismiss Plaintiff's claims or stay the case pending arbitration. (Docket No. 23.)

---

[3] Unless otherwise stated, the Courts references to Rules in this Order are to the Federal Rules of Civil Procedure.

## DISCUSSION

Defendant moves for dismissal on two primary grounds: 1) Plaintiff's claim must be resolved through arbitration pursuant to a mandatory arbitration agreement between Defendant and Leeper; and 2) the allegations in the SAC are insufficient to state a claim. The Court finds dismissal is appropriate under either argument.

**1.  Whether Plaintiff's Claim Must Be Arbitrated**

As discussed above, the Court previously dismissed Plaintiff's FAC after it found Plaintiff equitably estopped from avoiding arbitration. Its conclusion was based on the FAC's allegations that the testing and evaluation services Defendant provided to Leeper (from which Plaintiff's misrepresentation claims spawned), were subject to a contract between Defendant and Leeper, which contained an arbitration clause (the "Certification Agreement"). (*See* Docket No. 21.) The operative SAC omits all references to the Certification Agreement. Nevertheless, Defendant's motion argues that the SAC "is still based on [Defendant's] duties, representations, and performance connected with the Certification Agreement," and therefore Plaintiff remains equitably estopped from avoiding the Certification Agreement's arbitration clause. (Mot. at p. 6.) The Court agrees.

As set forth in the Court's *January 30, 2018 Order*, Section 2 of the Federal Arbitration Act ("FAA") states that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 demonstrates "'a national policy favoring arbitration' of claims that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 352–53 (2008) (citing *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984)).

Under Section 3 of the FAA, where an issue involved in a suit or proceeding is referable to arbitration under an agreement in writing, the district court "shall on

application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. The language is mandatory, and district courts are required to order arbitration on issues as to which an arbitration agreement has been signed. *Kilgore v. KeyBank, N.A.*, 718 F.3d 1052, 1058 (9th Cir. 2013) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). The role of the district court is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Arbitration is a matter of contract, and a party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994). A court must determine whether there is an agreement to arbitrate before ordering arbitration. *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1048 (9th Cir. 1996).

Defendant contends Plaintiff's claim must be arbitrated because the SAC's allegations regarding the testing and evaluation services it conducted at Leeper's behest (and from which Plaintiff's alleged false misrepresentations originate) were part of its performance of its duties under the Certification Agreement. It provided a copy of the Certification Agreement,[4] which states in relevant part:

---

[4] Defendant's motion to dismiss for lack of subject matter jurisdiction presents a factual attack because it "relie[s] on extrinsic evidence and [does] not assert lack of subject matter jurisdiction solely on the basis of the pleadings." *See Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003)). "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* (citing *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)). Additionally, the court need not assume the truth of the plaintiff's allegations, and "once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence

7

> If the Client is located in China, any dispute or claim arising from or in connection with this Certification Agreement, its breach, its performance or non-performance shall be submitted to the China International Economic Trade Arbitration Commission ("CIETAC") Beijing Office for arbitration which shall be conducted in accordance with the Commission's arbitration rules in effect at the time of applying for arbitration.

(Mot. at p. 3; Declaration of Todd Andrews ("Andrews Decl.") ¶ 4, Ex. A at § 7.6.)

In opposition, Plaintiff bemoans that it "inserted unnecessary facts about the [Certification Agreement] into the Complaint and First Amended Complaint," which has resulted in "interfer[ence] with [its] lawsuit thus far by its own making." (Opp'n at p. 9.) Subsequently, Plaintiff "amended its First Amended Complaint to completely remove any reference to the Certification Agreement containing the arbitration provision at issue or [Defendant's] certification of Plaintiff's rice cookers" in an effort to demonstrate that the "core" of its claims derive from "safety testing and misrepresentations about the results of its safety testing." (*Id.* at p. 8.)

In essence, Plaintiff argues that the Certification Agreement is not relevant (and thus the arbitration clause does not apply) because it merely "concerns what happens after [Defendant] performs safety testing and a product is found eligible to receive [Defendant's] ETL certification mark." (*Id.* at p. 9.) Without citing to relevant authority, presenting any rebuttal affidavits or evidence, or identifying relevant portions of the SAC, Plaintiff further argues there was "no written agreement regarding the testing and evaluation of the rice cookers, or reporting of the results." (*Id.* at p. 19) Rather, "[t]he testing was performed under an understanding akin to an oral agreement that if the rice cookers passed the relevant safety standards, the manufacturer and [Defendant] would enter a written, Certification Agreement [sic]" with Leeper. (*Id.*) Finally, Plaintiff argues that it should not be equitably estopped from advancing its claims because it did

---

necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.* (quoting *Savage,* 343 F.3d at 1039 n.2.).

not receive a "direct benefit" from the Certification Agreement. None of Plaintiff's arguments are persuasive.

First, as Plaintiff concedes, it would be "disingenuous" for Plaintiff "to argue the safety testing and Certification Agreement are in no way related." (Opp'n at p. 8.) In other words, by Plaintiff's own concession, its claim is at least related, *i.e.,* "connected," with the Certification Agreement.

Second, Plaintiff's arguments are not supported by its own allegations. As noted in the factual background above, Plaintiff has not alleged the existence of any contract or direct communications between itself and Defendant. It relies entirely on statements Defendant allegedly made to Leeper, which Leeper allegedly or impliedly made to Plaintiff. As a result, Plaintiff cannot plausibly establish the existence of a separate contract for testing and evaluation that pre-dates the Certification Agreement. Moreover, the Certification Agreement itself contemplates both Defendant's testing and evaluation services *and* certification. (*See* Andrews Decl. ¶ 4, Ex. A at § 2.5) ("Third Parties. [Leeper] agrees that Intertek has entered into a contractual relationship with the [Leeper] to perform testing or evaluation services on the Product. Intertek agrees to perform such service with due care. Intertek does not guarantee and warrant that third parties will accept or recognize *the results obtained by Intertek* or the Intertek certification of the Product.") (emphasis added.)

Third, the Certification Agreement's arbitration clause broadly includes "any dispute or claim arising from or in connection with this Certification Agreement." (Andrews Decl. ¶ 4, Ex. A at § 2.6.) Like the FAC, the SAC's allegations indicate that Defendant did not make any representations to Plaintiff that were not first made to Leeper. Indeed, Plaintiff's own recitation of the facts in its opposition support this conclusion. (*See* Opp'n at pp. 3-5) (summarizing that all alleged misrepresentations were first relayed to Leeper.) Thus, Plaintiff's own allegations indicate the alleged misrepresentations occurred during the course of Defendant's performance of its duties under the Certification Agreement.

9

As a result, the Court finds Plaintiff's arguments that: 1) the misrepresentations alleged in the SAC were made during the course of performance of a separate unwritten contract between Defendant and Leeper, and 2) Defendant and Leeper did not intend for the pre-Certification testing and evaluation to be covered under the scope of the Certification Agreement's arbitration clause, are unpersuasive because they are based on pure speculation.

Fourth, the Court is not convinced Plaintiff did not receive a direct benefit from the Certification Agreement. According to the SAC, Leeper (and Leeper alone) engaged Defendant to provide testing and evaluation services for the various rice cooker prototypes, which Leeper manufactured in accordance with Plaintiff's concept. However, the SAC also alleges Defendant knew that both Leeper and Plaintiff would rely on Defendant's statements to Leeper regarding the prototypes' compliance with the Safety Standards. And, the SAC further alleges that Plaintiff relied on Defendant's statements to Leeper in deciding to order large quantities of Leeper's prototypes for eventual sale throughout North America.

From these facts, the Court can draw a reasonable inference that Plaintiff did in fact receive direct benefits from the Certification Agreement: assurances that Leeper's prototypes of their rice cookers met the Safety Standards such that Plaintiff could move forward with its plans to "mass produce a large quantity of the rice cookers which [Plaintiff] would sell in North America." (SAC ¶ 33.)

In sum, even construing all factual inferences in Plaintiff's favor, Plaintiff has failed to demonstrate that its claim falls outside the scope of the Certification Agreement's arbitration clause. Therefore, the Court incorporates by reference the reasoning in its *January 30, 2018 Order* regarding principles of equitable estoppel. (*See* Docket No. 21 at pp. 7-10.) In short, equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer*, 436 F.3d at 1101 (quoting *Wash. Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 267 (5th Cir. 2004)) (internal quotation marks omitted). Based on

10

the allegations of the SAC, the Court concludes Plaintiff is once again attempting to exploit the terms of the Certification Agreement and simultaneously avoid the arbitration clause. Accordingly, the Court finds Plaintiff is equitably estopped from avoiding the arbitration of its claim. Defendant's motion on this ground is **GRANTED**.

## 2. Whether Plaintiff's SAC Fails to State a Claim

Even if Plaintiff was not equitably estopped from avoiding arbitration, the Court agrees with Defendant that the SAC should be dismissed for failure to state a claim.

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint if the complaint fails to state a plausible claim for relief on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Dismissal is appropriate if the complaint fails to state enough facts to raise a reasonable expectation that discovery will reveal evidence of the matter complained of, or if the complaint lacks a cognizable legal theory under which relief may be granted. *Twombly*, 550 U.S. at 556.

"A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). All factual allegations are accepted as true and "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

While the Court must draw all reasonable inferences in the non-movant's favor, it need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

To state a claim for negligent misrepresentation under California law, a plaintiff must plausibly allege: (1) a misrepresentation of a fact, (2) by a person who does not have reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) actual and justifiable reliance, and (5) resulting damage. *See Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230-31 (2013); *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1201 (9th Cir. 2001). Contrary to Plaintiff's assertions otherwise, California law requires that each element of a negligent misrepresentation claim "be ple[d] with particularity. . . although less specificity is required if the defendant would likely have greater knowledge of the facts than the plaintiff." *Chapman*, 220 Cal. App. 4th at. 231 (citing *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 216-217 (1983)).

Defendant argues "Plaintiff's allegations fail to allege with specificity what fraudulent statements were made to Plaintiff, by whom and to whom they were made, when they were made, and how they were fraudulent." (Mot. at p. 17.) Rather than identify the portions of the SAC that satisfy these elements, Plaintiff incorrectly counters that it is not subject to Rule 9(b)'s heightened pleading standards. (*See* Opp'n at pp. 22-24.) The Court agrees with Defendant that the SAC fails to plead the requisite elements with particularity.

However, even if the Court applied Rule 8(a)'s more lenient pleading standard, which only requires the SAC include "a short and plain statement of the claim showing [it] is entitled to relief," Plaintiff has not met its pleading burden. As detailed above, each alleged misrepresentation of fact Plaintiff relies on was conveyed by Leeper. But nothing in the SAC establishes that Leeper served as Defendant's agent, or that Leeper served as Plaintiff's agent.[5] And Plaintiff has not alleged facts to plausibly establish

---

[5] Understandably, Plaintiff may have declined to allege that Leeper served as its agent lest it establish an additional reason why its claim was subject to the Certification Agreement's arbitration clause.

12

either that Leeper did not have reasonable grounds for believing it to be true, or that Leeper intended to induce Plaintiff's reliance on the fact allegedly misrepresented.

Moreover, even if the Court ignores the fact that the SAC fails to establish any direct misrepresentations from Defendant to Plaintiff, it cannot ignore the lack of factual allegations to establish Defendant's intent to induce Plaintiff to rely on its alleged misrepresentations, or that Plaintiff's reliance on the misrepresentations was reasonable. The SAC's sole factual allegation that addresses these elements states Defendant "was specifically aware of the fact that once it represented the rice cookers complied with the safety standards, Leeper and [Plaintiff] would arrange to mass produce a large quantity of the rice cookers which [Plaintiff] would sell in North America." (SAC ¶ 33.) In sum, the SAC is completely devoid of allegations to plausibly establish how Defendant was aware that Plaintiff would rely on its statements to Leeper, and why Plaintiff's reliance was reasonable.

Therefore, under both Rule 8(a)'s and Rule 9(b)'s pleading standards, the SAC fails to state a claim for relief, and Defendant's motion to dismiss is also **GRANTED** on this ground.

**3.     Whether to Grant Leave to Amend**

Although not requested by Plaintiff, the Court has nevertheless considered whether justice requires providing Plaintiff with an additional opportunity to amend its pleading. Fed. R. Civ. P. 15(a)(2). The Court's *January 30, 2018 Order* detailed several deficiencies in Plaintiff's FAC, which Plaintiff failed to cure in its SAC. (*See* Docket No. 21.) As discussed in detail above, the SAC suffers from the same, if not greater, deficiencies than those previously identified in the Court's *January 30, 2018 Order*. In addition, the Court finds Defendant would be prejudiced if Plaintiff was allowed to file a third amended complaint – having now prevailed twice on its motions to dismiss the same claims, and in the absence of grounds to justify amendment of the claims. Fed. R. Civ. P. 15(a)(2). Therefore, Plaintiff's Second Amended Complaint is **DISMISSED with prejudice**.

13

## CONCLUSION

For all of the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED**, and Plaintiff's Second Amended Complaint is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Dated: August 20, 2018

_____
Hon. Roger T. Benitez
United States District Judge